**FILED**

**JAN 1 4 2015**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>    **c/o United States Attorney's Office** )<br>    **Judiciary Center Building** )<br>    **555 Fourth St., N.W.** )<br>    **Washington, D.C. 20530** )<br>)<br>        **Plaintiff,** )<br>)<br>    **v.** )<br>)<br>**REAL PROPERTY LOCATED AT** )<br>**3284 N STREET N.W.,** )<br>**WASHINGTON, D.C. 20007,** )<br>)<br>        **Defendant.** )<br>) | Case: 1:15–cv–00058<br>Assigned To : Jackson, Amy Berman<br>Assign. Date : 1/14/2015<br>Description: General Civil(Other)<br><br>**UNDER SEAL** |

## VERIFIED COMPLAINT FOR CIVIL FORFEITURE ACTION IN REM

Plaintiff, United States of America, by and through its attorney, the United States Attorney for the District of Columbia, brings this Verified Complaint for Forfeiture against the real property located at 3284 N Street N.W., Washington, D.C., and alleges as follows in accordance with Supplemental Rule for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rule") G(2):

### I.    NATURE OF THE ACTION

1.    This is a civil forfeiture action *in rem* to forfeit all right, title, and interest in the defendant property pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A).

### II.    THE DEFENDANT PROPERTY

2.    The defendant property is the real property located at 3284 N Street N.W., Washington, D.C., with all appurtenances, improvements, and attachments thereon, and is more fully described as: Lot No. 0034 in Square 1219, described as follows, to wit: Lot numbered

**RECEIVED**

**NOV 1 2 2014**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia



*3*

Thirty-four (34) in Charles A Sickel's subdivision of part of Square numbered twelve Hundred Nineteen (1219), as per plat recorded in Liber 25, folio 91 of the Records of the Office of the Surveyor for the District of Columbia.

3.    The defendant property is titled in the name of JOHN T. FITZGERALD ("FITZGERALD").

### III.    JUDICIAL AUTHORIZATION AND PROCESS

4.    Under Supplemental Rule G(3)(a), the United States must comply with the procedures in 18 U.S.C. § 985 when initiating civil forfeiture actions against real property.

5.    The defendant property has not been seized.  The United States does not seek authority under 18 U.S.C. § 985(d)(1) to seize the defendant property prior to trial.  In accordance with 18 U.S.C. § 985(b)(1)(A), the defendant property will not be seized until the entry of a forfeiture order.

6.    Upon lifting of the sealing order associated with this Complaint, the United States will:

a.  post notice of this Complaint on the defendant  property as required by 18 U.S.C. § 985(c)(1)(B);

b.  serve notice of this action and a copy of this Complaint on FITZGERALD, the property owner, as required by 18 U.S.C. § 985(c)(1)(C);

c.  send notice of this action and a copy of this Complaint to any person who reasonably appears to be a potential claimant as required by Supplemental Rule G(4)(b); and

d.  publish notice of this action pursuant to the procedures in Supplemental Rule G(4)(a).

## IV.   JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345, as this is a civil action commenced by the United States; and pursuant to 28 U.S.C. § 1355(a), as this is an action or proceeding for the recovery or enforcement of a forfeiture.

8.     This Court has *in rem* jurisdiction pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred within the District of Columbia; and pursuant to 28 U.S.C. § 1355(b)(1)(B), which provides for *in rem* jurisdiction in any district where venue is proper under 28 U.S.C. § 1395.

9.     Venue in the District of Columbia is proper pursuant to 28 U.S.C. §1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred within the District of Columbia; and pursuant to 28 U.S.C. § 1395(b) because the defendant property is found within the District of Columbia.

## V.   BASIS FOR FORFEITURE

10.     As detailed below, FITZGERALD embezzled funds from his employer in violation of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1349 (Conspiracy to Commit Mail and Wire Fraud).  He then made payments on debts associated with the defendant property with fraudulently obtained proceeds.  These payments were monetary transaction in violation of 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity).

11.     Based on the facts set forth in this Complaint, there is a reasonable belief that the defendant property is subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as real property, which constitutes or is derived from proceeds traceable to an offense constituting a specified unlawful activity.  There is also a reasonable belief that the defendant property is subject to

forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A), as real property involved in a transaction in violation of 18 U.S.C. § 1957.

VI.    **FACTS**

**Background**

12.    FITZGERALD and BRYAN DAVID WRIGHT ("WRIGHT") conspired to obtain approximately $1,275,000 from FITZGERALD's former employer, Goldman Sachs, by means of materially false and fraudulent pretenses.  The investigation has shown that FITZGERALD installed WRIGHT as a project consultant and approved payments to WRIGHT in order to fraudulently collect funds from development projects FITZGERALD oversaw as an executive with Goldman Sachs.

13.    Goldman Sachs is an American multinational investment banking firm that engages in global investment banking, securities, investment management, and other financial services primarily with institutional clients.

14.    From September 2008 until January 2014, FITZGERALD was employed by Goldman Sachs and worked in a division that focused on real estate investments and developments.  FITZGERALD's office was located in the 1700 block of Pennsylvania Avenue NW, Washington, D.C.  FITZGERALD resigned from his position as a vice president who oversaw Goldman Sachs' real estate development investments in the greater Washington, DC area for unrelated reasons. As part of that position, FITZGERALD was authorized to approve construction-related invoices on behalf of the company.

15.    Whiting-Turner is one of the nation's largest construction management and general contracting companies. Goldman Sachs hired Whiting-Turner to provide construction

services on several developments in the greater Washington, D.C. area for which FITZGERALD served as the owner's representative.

16.     WRIGHT is the president of Blackwood of DC, a commercial concrete construction company located at 5151 Wisconsin Ave NW, Washington, D.C.

17.     WRIGHT is also the owner of P&E Services.

18.     In August 2014, representatives of Goldman Sachs advised law enforcement of the allegations regarding FITZGERALD's conduct detailed herein. The investigation has shown that FITZGERALD installed WRIGHT as a project consultant and approved payments to WRIGHT in order to fraudulently collect funds from development projects FITZGERALD oversaw as an executive with Goldman Sachs.

### *The Scheme to Defraud*

**A.     Payments to Onsight Management - Station Ridge Project**

19.     Between July 2011 and October 2011, Whiting-Turner paid Onsight Management $41,025, via three checks, pursuant to invoices related to a Goldman Sachs' funded project managed by Whiting-Turner known as Station Ridge. FITZGERALD was the owner's representative for this project on behalf of Goldman Sachs. WRIGHT was listed as the point-of-contact on the Onsight Management invoices.

20.     The contracts between Goldman Sachs (as owner) and Whiting-Turner (as contractor) for the work required for Station Ridge were negotiated by FITZGERALD and specified that another entity, Arc Realty, would serve as the "Construction Manager" representing Goldman Sachs with respect to the project. There was no mention of Onsight Management in the contracts between Goldman Sachs and Whiting-Turner for Station Ridge.

21.     During the execution of the project, FITZGERALD provided Whiting-Turner with invoices from Onsight Management and directed Whiting-Turner to pay Onsight Management from the project budget.

22.     The Whiting-Turner executive was unaware that WRIGHT was associated with Onsight Management at that time.

23,     Goldman Sachs was also unaware of FITZGERALD's association with Onsight Management during the timeframe of FITZGERALD's employment with Goldman Sachs.

24.     The three checks totaling $41,025 from Whiting-Turner payable to Onsight Management were deposited into a FITZGERALD controlled account ending in 9442 at the Bank of Georgetown. This account was held in the name of Onsight Management

25.     The invoices submitted to Whiting-Turner for payments to Onsight Management directed the checks to be mailed to P.O. Box 17342, Arlington, VA.

**B.     FITZGERALD's Control of Onsight Management**

26.     FITZGERALD is the controlling entity behind Onsight Management, a fact which he attempted to conceal.

27.     On May 20, 2011, Fitzgerald Development LLC changed its name to Onsight Management LLC.

28.     FITZGERALD rented P.O. Box 17342, which is where Whiting-Turner mailed the checks to Onsight Management.

29.     In or about September 2010, FITZGERALD originally established the account ending in 9442 in the name Fitzgerald Development; however, in or about June 2011, FITZGERALD changed the name of the account to Onsight Management.

### C.      Payments to P&E Services - Station Ridge II Project

30.      In November 2011, WRIGHT, on behalf of P&E Services, signed a contract with Goldman Sachs for a stated rate of $365,000 to provide project management duties on a development project funded by Goldman Sachs called Station Ridge II, which was located in Maryland. As was the case with Station Ridge, Goldman Sachs hired Whiting-Turner to be the general contractor for multiple aspects of the Station Ridge II project.

31.      FITZGERALD, on behalf of Goldman Sachs, negotiated three separate contracts with Whiting-Turner for work associated with Station Ridge II. These contracts were executed in or around the end of 2011 and early 2012.

32.      Each of the three contracts FITZGERALD negotiated with Whiting-Turner specified that Goldman Sachs had engaged P&E Services to provide construction management services with respect to the projects.

33.      Between January 2012 and January 2013, Whiting-Turner disbursed $417,708 in check payments to P&E Services on behalf of Goldman Sachs.

34.      Between October 2011 and May 2013, FITZGERALD also authorized $816,099 worth of check payments payable directly from Goldman Sachs to P&E Services for the same development project.

35.      Thus, P&E Services received $1,233,807 in payments between October 2011 and May 2013.

36.      The contract P&E Services signed with Goldman Sachs for Station Ridge II stated that P& E Services' scope of work "was for certain 'Basic Services' consisting of project management duties in connection with the design and construction of the Project." The invoices P&E Services submitted to Goldman Sachs for Station Ridge II for payment reflect

"Construction Management" and "Project Management" as the description of work. Goldman Sachs does not know the extent to which, if at all, P&E Services actually performed the work that was billed.

37.     Each of the contracts Whiting-Turner signed with Goldman Sachs related to Station Ridge II state that Goldman Sachs, "has engaged P&E Services, a Construction Manager ("CM") to provide certain construction management services with respect to the Project…The designated representative of CM for the Project is Bryan Wright." The executive from Whiting-Turner was unaware of the payments Goldman Sachs made to P&E Services for the Station Ridge II project.

**D.     WRIGHT's Control of P&E Services**

38.     WRIGHT formed P&E Services in June 2011. P&E Services is associated with an address of 3470 Olney-Laytonsville Road, Suite 186, Olney, MD. This address is a UPS Store, and "Suite 186" is actually a mailbox. WRIGHT rented mailbox 186 in June 2011.

39.     The checks paid to P&E Services by both Goldman Sachs and Whiting-Turner were deposited into P&E Services' account ending in 8277 at TD Bank. WRIGHT is the sole signatory for this account, which WRIGHT opened in the District of Columbia in August 2011.

40.     WRIGHT caused $1,233,807 in deposits to be made to this account from checks paid to P&E Services by Whiting-Turner and Goldman Sachs.

41.     Between October 2011 and May 2013, WRIGHT paid $568,295 to Onsight Management in checks. Thus, of the $1,233,807 Goldman Sachs and Whiting-Turner paid to WRIGHT, via P&E Services, WRIGHT retained approximately $665,500, and he passed on the balance of the funds, $568,295, to FITZGERALD.

### Payments Into Defendant Property With Funds Involved In, And Traceable To, Illegal Activity

**A.    Movement and Commingling of Illegal Wire and Mail Fraud Proceeds**

27.    FITZGERALD is the sole owner/signer to the Bank of Georgetown account ending 9442 established in the name of Onsight Management.

28.    Between June 2011 and July 2013, FITZGERALD wire transferred a total of $254,500 from his Onsight Management Bank of Georgetown account ending in 9442 to his personal account ending in 9885 with Bank of Georgetown.

29.    FITZGERALD's balance in his Bank of Georgetown personal account ending in 9885 at the time of the first transfer from his Onsight Management Bank of Georgetown account ending in 9442, which occurred on or about June 30, 2011, was $4,686.36.

30.    In addition to the intrabank wire transfers, on or about March 26, 2013, FITZGERALD wrote himself a $25,000 check from the Onsight Management Bank of Georgetown account ending in 9442, which he deposited into his Bank of Georgetown personal account ending in 9885.

31.    Thus, during the timeframe of the illegal activity, FITZGERALD transferred a total of $279,500 from the Onsight Management account at Bank of Georgetown account ending in 9442 to his personal account at the Bank of Georgetown account ending in 9885. FITZGERALD funded his Bank of Georgetown account ending in 9885 from other sources as well.

**B.    Mortgage Payments**

32.    According to property records, FITZGERALD purchased 3284 N Street N.W., Washington, D.C. 20007 (i.e. FITZGERALD's primary residence) in March 2009 for

$1,312,000. BB&T holds a mortgage on this real property. The current mortgage balance is approximately $752,345.

33.     Between July 2011 and July 2013, FITZGERALD paid approximately $84,067.68, which funds contained illegal mail and wire fraud proceeds, towards his mortgage from his personal account ending in 9885 with Bank of Georgetown. These payments were typically in amounts from $3,400 to $3,800.

**C.     Payments on Home Equity Line of Credit**

34.     P&E Services disbursed checks totaling $568,295, which FITZGERALD deposited into the Onsight Management account ending in 9442 at Bank of Georgetown. These deposits correspond with the above described scheme to defraud.

35.     FITZGERALD also caused deposits of $41,025 in funds from Whiting-Turner to be deposited into his Bank of Georgetown account ending in 9442, which deposits correspond with the above described scheme to defraud.

36.     FITZGERALD laundered a significant portion of the wire and mail fraud proceeds by making payments on his $200,000 home equity line of credit ("HELOC") at BB&T, account ending in 5998.

37.     FITZGERALD secured his HELOC with the real property situated at 3284 N Street N.W., Washington, D.C. 20007.

38.     The sum of the HELOC payments FITZGERALD made to his BB&T account ending in 5998 from his Onsight Management account at Bank of Georgetown ending in 9442 during the timeframe of the illegal scheme was $184,000. FITZGERALD made these payments via eight checks, which were as follows:

| Date | Amount |
|---|---|
| 6/7/2012 | $ 9,000.00 |
| 7/2/2012 | $ 30,000.00 |
| 8/14/2012 | $ 25,000.00 |
| 9/20/2012 | $ 20,000.00 |
| 10/25/2012 | $ 25,000.00 |
| 11/6/2012 | $ 25,000.00 |
| 11/17/2012 | $ 25,000.00 |
| 1/30/2013 | $ 25,000.00 |
| TOTAL | $184,000.00 |

39.     FITZGERALD's account balance in his Onsight Management account at the Bank of Georgetown account ending in 9442 was $10.26 prior to FITZGERALD's first deposit of funds obtained from WRIGHT.

40.     Between July 2011 and July 2013, FITZGERALD also paid approximately $58,525.00 towards this same HELOC at BB&T from his personal account ending in 9885 with Bank of Georgetown. FITZGERALD made all of these payments in increments of under $10,000. As identified above, his personal account ending in 9885 with Bank of Georgetown contained illegal mail and wire fraud proceeds within it.

## VII.   COUNTS

### Count One – Forfeiture as Proceeds of Mail Fraud Offense

41.     Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

42.     Title 18, United States Code, Section 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18], or a conspiracy to commit such offense" is subject to forfeiture.

43.     A "specified unlawful activity" as defined in section 1956(c)(7) includes "any act

or activity constituting an offense listed in section 1961(1)" of Title 18.  Mail Fraud, in violation

of 18 U.S.C. § 1341, is an offense listed in section 1961(1).

44.     Section 1341 provides that "[w]hoever, having devised or intending to devise any

scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice

or attempting so to do, places in any post office or authorized depository for mail matter, any

matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be

deposited any matter or thing whatever to be sent or delivered by any private or commercial

interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to

be delivered by mail or such carrier according to the direction thereon, or at the place at which it

is directed to be delivered by the person to whom it is addressed, any such matter or thing" has

committed a criminal offense.

45.     Section 1349 criminalizes a conspiracy to violate Section 1341.

46.     The defendant property is subject to forfeiture, pursuant to 18 U.S.C.

§ 981(a)(1)(C), as real property, which constitutes or is derived from proceeds traceable to a mail

fraud violation.

47.     The defendant property is subject to forfeiture, pursuant to 18 U.S.C.

§ 981(a)(1)(C), as real property, which constitutes or is derived from proceeds traceable to a mail

fraud conspiracy violation.

## Count Two – Forfeiture as Proceeds of Wire Fraud Offense

48.     Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

49.     Title 18, United States Code, Section 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18], or a conspiracy to commit such offense" is subject to forfeiture.

50.     A "specified unlawful activity" as defined in section 1956(c)(7) includes "any act or activity constituting an offense listed in section 1961(1)" of Title 18.  Wire Fraud, in violation of 18 U.S.C. § 1343, is an offense listed in section 1961(1).

51.     Section 1343 of Title 18 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" has committed a criminal offense.

52.     Section 1349 criminalizes a conspiracy to violate Section 1343.

53.     The defendant property is subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as real property, which constitutes or is derived from proceeds traceable to a wire fraud violation.

54.     The defendant property is subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as real property, which constitutes or is derived from proceeds traceable to a wire fraud conspiracy violation.

## Count Three – Forfeiture as Property Involved in a Money Laundering Transaction

55.     Each of the foregoing allegations is hereby incorporated by reference as if fully set forth herein.

56.     Title 18, United States Code, Section 981(a)(1)(A) provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section . . . 1957 of [Title 18], or any property traceable to such property" is subject to forfeiture.

57.     Section 1957 provides that whoever, "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity" has committed a criminal offense.

58.     Section 1957(f)(1) defines "monetary transaction" as the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . ." Section 1956(c)(6)(A) defines "financial institution" to include "any financial institution, as defined in section 5312(a)(2) of Title 31 . . ." Section 5312(a)(2)(u) defines a financial institution as "persons involved in real estate closings and settlements."

59.     Section 1956(h) criminalizes a conspiracy to violate Section 1957.

60.     The defendant property is subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A), as real property involved in transactions in violation of 18 U.S.C.§ 1957.

61.     The defendant property is subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A), as real property involved in transactions in violation of 18 U.S.C.§ 1956(h).

## VIII.   <u>CONCLUSION</u>

**WHEREFORE**, the United States prays that this Court decree that all right, title, and interest in the defendant property be condemned and forfeited to the United States of America, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Ronald C. Machen Jr.*
RONALD C. MACHEN JR., D.C. Bar No. 447889
United States Attorney for the District of Columbia

*/s/ Zia Faruqui*
Zia Faruqui, D.C. Bar Number 494990
Assistant United States Attorney
555 Fourth Street, N.W.,
Washington, D.C. 20530
(202) 252-7117
zia.faruqui@usdoj.gov

## VERIFICATION

I, Joshua Huckel, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 10, 2014

        /s/ Joshua Huckel
Special Agent Joshua Huckel
Federal Bureau of Investigation